NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240994-U

NO. 4-24-0994

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* D.N., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 21JA79 |
| v. | ) | |
| Durell N., | ) | Honorable |
| Respondent-Appellant). | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held:*   The appellate court affirmed the trial court's termination of respondent's parental
rights because the court's fitness and best-interest findings were not against the
manifest weight of the evidence.

¶ 2     Respondent, Durell N., is the father of D.N. (born March 2021). (We note that the
mother of D.N. is not a party to this appeal.) In June 2024, the trial court found respondent was
an unfit parent, and in July 2024, it found termination of respondent's parental rights would be in
the minor's best interest.

¶ 3     Respondent appeals, arguing that the trial court's (1) unfitness and (2) best
interest findings were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                              I. BACKGROUND

¶ 5                              A. Procedural History

¶ 6     In June 2021, the State filed a petition for adjudication of wardship, alleging D.N.

was neglected in that her environment was injurious to her welfare due to (1) domestic violence between respondent and D.N.'s mother and (2) D.N.'s mother's drug use. 705 ILCS 405/2-3(1)(b) (West 2020). That same month, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of D.N. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 7            In October 2021, the trial court adjudicated D.N. a neglected minor.

¶ 8            In November 2021, the trial court conducted a dispositional hearing, at which it entered a written order finding respondent "unfit, unable or unwilling" for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline D.N. The court also (1) adjudicated D.N. a ward of the court, (2) placed guardianship and custody of D.N. with the guardianship administrator of DCFS, and (3) admonished respondent that he "must cooperate with DCFS, comply with the terms of the service plan, and correct conditions that require [D.N.] to be in care, or risk termination of [his] parental rights." Specifically, the court ordered that respondent must complete (1) substance abuse treatment, (2) domestic violence services, and (3) parenting classes.

¶ 9                            B. The Termination Hearing

¶ 10            In December 2023, the State filed a motion for termination of parental rights, alleging that respondent was an unfit parent because he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to D.N.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of D.N. from respondent within the nine-month periods of October 2021 to July 2022, July 2022 to April 2023, and March 2023 to December 2023 (*id.* § 1(D)(m)(i)); (3) failed to make reasonable progress toward the return of D.N. to him within the same nine-month periods (*id.*

§ 1(D)(m)(ii)); and (4) was depraved, as evidenced by four prior felony convictions (*id.* § 1(D)(i))).

¶ 11                                    1. *The Fitness Proceedings*

¶ 12            In June 2024, the trial court conducted the fitness portion of the termination proceedings. At the State's request, the court took judicial notice of the adjudicatory and dispositional orders.

¶ 13                                    a. Lauren Masten

¶ 14            The State called Lauren Masten, who testified that she was previously employed as a family therapist at the Family Service Center. In that capacity, she served first as the caseworker for D.N.'s case when D.N. came into care in June 2021, and then as the supervisor over D.N.'s case until she left the agency in April 2023. (A subsequent witness, Danielle Croll, testified that she took over as D.N.'s caseworker in May 2022.) D.N. was three months old when she came into care due to domestic violence between respondent and D.N.'s mother. At the time of Masten's testimony, D.N. was three years old.

¶ 15            Masten did not complete an integrated assessment for respondent at the beginning of the case because respondent declined to participate in the interview necessary to generate the assessment (which, she explained, was intended to identify any issues the family was facing in order to recommend services). Nonetheless, Masten created a service plan for respondent based upon "the reasons why the case came into care and then conversations that we had with him." Respondent's required services included "cooperation [with DCFS], housing and income, parenting, domestic violence, [and] substance abuse," as well as drug tests and visits with D.N.

¶ 16            In July 2021, respondent participated in a "child and family team meeting," at which the attendees discussed "why the case came into care and what services needed to be

completed in order to get his child returned to his care." Respondent understood all the service plan requirements.

¶ 17        Masten testified that respondent became incarcerated in November 2021. Prior to that, during the first four months Masten was assigned to the case, respondent "mostly" attended visits with D.N., but he missed about four or five. Additionally, in July 2021, respondent completed an oral drug screen, the results of which were positive for tetrahydrocannabinol (THC) and cocaine. Because it was an oral screen, Masten "would have" asked him to submit a urine sample for confirmation, but respondent did not complete one.

¶ 18        During Masten's testimony, at the State's request, the trial court admitted into evidence certified copies of four felony convictions for respondent in Sangamon County. Specifically, (1) in case No. 20-CF-895, respondent was convicted of domestic battery with a prior domestic battery conviction, a Class 4 felony; (2) in case No. 10-CF-174, respondent was convicted of domestic battery with a prior domestic battery conviction, a Class 4 felony; (3) in case No. 09-CF-637, respondent was convicted of possession of a controlled substance (cocaine), a Class 4 felony; and (4) in case No. 07-CF-526, respondent was convicted of aggravated unlawful use of a weapon, a Class 4 felony.

¶ 19        On cross-examination by respondent's attorney, Masten testified that at the beginning of the case, she referred respondent for a substance abuse assessment, domestic violence counseling, and parenting classes. He attended some domestic violence and parenting sessions (approximately one or two) but then told Masten he was going to stop services because he knew he was going to prison. However, during that time, respondent was attending his visits with D.N., and he let Masten know if he was not able to attend.

¶ 20        Respondent's attorney also asked Masten about an incident in August 2021,

during which respondent punched D.N.'s mother in the face. Masten stated that no arrest was made because respondent had left the scene, but the incident was "indicated by DCFS."

¶ 21                                      b. Danielle Croll

¶ 22        The State called Danielle Croll, who testified that in the course of her employment at Family Service Center, she served as D.N.'s caseworker from May 2022 to the present. When Croll took over the case, she had phone contact with respondent. At that time, respondent was required to complete services that included "parenting, substance abuse, [and] domestic violence." He was also expected to maintain stable housing and employment and visit with D.N. Croll also stated that respondent attended two "child and family team meetings."

¶ 23        Croll testified that respondent was released from prison in February 2023. She believed his incarceration "had something to do with driving." While incarcerated, respondent "reached out" to Croll "at least once a month." Croll stated that respondent could not complete services in prison due to "Covid protocols," but he did participate in video visits with D.N. "almost monthly" and had at least one in-person visit.

¶ 24        In August 2023, respondent provided Croll with his address. She attempted to complete a home safety check, but respondent was not there at the time. His paramour was present, and Croll told the paramour that respondent needed to "baby proof" the home, install smoke alarms, and provide veterinary records to prove that an aggressive dog at the residence was not violent. However, respondent never provided the requested records. As a result, no visitation with D.N. occurred at his home. (We note that on cross-examination, Croll testified that she also made these requests to respondent himself.)

¶ 25        The prosecutor then asked Croll about the status of respondent's services following his release from prison in February 2023. As of May 2024, he had completed "all 26

weeks of [domestic violence classes]." However, respondent did not pass the "post test," which was designed to "go over what you've learned." Croll stated she never received confirmation that he passed the test on his second attempt, noting that she requested a certificate of completion from the service provider, but she never received one.

¶ 26 Croll also testified respondent never completed a substance abuse assessment and attended only 8 drug screens out of approximately 30 that Croll had requested. Of those eight, five were negative for any drugs or alcohol, but respondent tested positive for (1) alcohol in December 2023, (2) THC and alcohol in February 2024, and (3) alcohol and cocaine in March 2024.

¶ 27 Croll further testified that respondent completed parenting classes in May 2023.

¶ 28 Regarding visits with D.N., Croll testified that respondent attended most of the visits he was offered, and they went well. The last visit occurred in April 2024. Croll offered a visit in May 2024 and provided the date in advance, which respondent agreed would work with his schedule. However, on that day, Croll brought D.N. to the agency, but respondent did not show up. He later texted Croll to say that he forgot about the visit.

¶ 29 On cross-examination by respondent's attorney, Croll testified that she had confirmed that respondent was employed at Mel-O-Cream Donuts. Counsel showed Croll Respondent's exhibit A, which, after reading, she identified as a letter from the domestic violence services provider. The letter was dated January 18, 2024, and was not addressed to any particular person. It stated that respondent (1) "had his assessment on 3/22/2023," (2) completed "all 26 groups," and (3) "did well on the test." At respondent's request, the trial court admitted the letter into evidence.

¶ 30 Croll agreed with respondent's counsel that, at the time of her testimony in June

2024, respondent had completed domestic violence and parenting services, engaged in visitation, and maintained housing and employment. The only service he did not engage in was substance abuse.

¶ 31    When respondent's attorney asked Croll whether she "fe[lt] like [respondent had] made progress toward the return home [of D.N.]," Croll answered that there had been progress in some services, but she still had safety concerns due to respondent's failure to engage in substance abuse services. She testified that, despite respondent's being "rated satisfactory" in all the services other than substance abuse, she was never close at any point in time to returning D.N. home to respondent. She explained that "the substance abuse [was] a big part why the case was opened."

¶ 32    On cross-examination by the guardian *ad litem* (GAL), Croll testified that D.N. had been in care for 1050 days. She also stated that respondent's reason for not attending most of his drug screens was that he did not have an identification (ID) card. When respondent attended visits with D.N., Croll observed a bond and appropriate parenting skills. Croll agreed with the GAL's characterization that respondent was engaged in services "for the most part."

¶ 33                        c. Respondent

¶ 34    Respondent testified that he was not able to complete services while he was incarcerated because the prison was on "lockdown" due to COVID-19. Despite that, he maintained contact with Croll. He stated that he never had contact with Croll's predecessor caseworker, Masten. When respondent was released from prison, he reached out to Croll, who provided him with the service plans. He obtained employment at Mel-O-Cream Donuts and had been employed there for seven months. He also had a residence that Croll inspected. Regarding the dog, respondent testified that it was a pit bull that was not aggressive. He explained that at

the time of Croll's visit, the dog was a puppy, "so [the puppy] didn't know who [Croll] was."

¶ 35　　　　Respondent testified that he attended most of the visits with D.N. that were offered to him. Regarding the missed May 2024 visit, he explained that he got his days mixed up and when he reached out to ask if it could be rescheduled, Croll said no.

¶ 36　　　　Respondent further testified that he completed the domestic violence test on his second attempt and completed the parenting course. Respondent's attorney asked him whether he ever obtained a substance abuse assessment, and respondent answered no, explaining, "I just never got around to it because she just told me last month that I had to do it." Counsel asked respondent if he had reached out to any service providers to obtain a substance abuse assessment, and respondent answered, "I've been working a lot. So, no."

¶ 37　　　　Respondent testified that he had a bond with D.N. and their visits went well. Although he had been convicted of felonies, none of them were violent. Since he was released from prison, respondent had made efforts to rehabilitate himself. He was trying to "stay focused" on his attempts to better himself and get his child back. He testified that, despite the positive drug test for cocaine, he did not habitually engage in the use of illicit substances and was willing to complete a substance abuse assessment and treatment.

¶ 38　　　　On cross-examination by the State, respondent testified that he had received the service plans and was aware of the required services. He agreed with the prosecutor that he had three to four months before his incarceration to complete some services. Respondent stated that he had engaged in domestic violence classes before he was imprisoned but did not have time to complete them. He did not complete a substance abuse assessment. Prior to his incarceration, an oral swab tested positive for cocaine. He was released from custody in February 2023 and tested positive in March 2023 for alcohol and cocaine. He admitted that he consumed alcohol but said,

"I can't tell you why I tested positive for coke."

¶ 39    On cross-examination by the GAL, respondent testified that upon his release, he did not have the proper paperwork to get an ID card, which he needed for drug screens. He obtained an ID card in September or October 2023. When the GAL asked why he missed drug tests after he obtained his ID card, respondent answered, "Cause I was working a lot and the time [*sic*] I was at work." He understood that failures to appear for drug tests would be construed as "dirty drops."

¶ 40                              d. The Trial Court's Ruling

¶ 41    The trial court found that the State had proved by clear and convincing evidence that respondent was unfit because he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to D.N.'s welfare and (2) failed to make reasonable progress toward the return of D.N. during the nine-month periods alleged in the petition (October 2021 through July 2022, July 2022 through April 2023, and March 2023 to December 2023).

¶ 42    The trial court explained that respondent's incarceration interfered with his ability to make progress, but

> "that is the situation that [respondent] found himself in and that is the situation that I must look at in regards to progress and movement toward the goal of reunification and I cannot say and I do say that I am not in a position to say reunification will happen in the near future."

¶ 43    When addressing respondent's lack of progress, the trial court focused on (1) drug and alcohol treatment and (2) domestic violence classes, pointing specifically to respondent's prior convictions for felony domestic battery and possession of cocaine. The court found that respondent's record "clearly demonstrates a need for treatment in relationship to domestic

- 9 -

battery" and "drug addictions and abuse." The court noted that respondent "hasn't gotten the necessary treatment and has resisted that treatment during the whole life of this case."

¶ 44       The trial court acknowledged that respondent completed the domestic violence course and passed the test, but it found "that completion, however, is very recent and for much of the life of the case there was no progress on it." While acknowledging that a substantial reason for respondent's late completion was due to his incarceration, the court reiterated, "We find you as you are in regards to reasonable progress," and concluded that the court "cannot say that I am in a position where I think we can move forward to a reasonable degree in regards to reunification."

¶ 45       The trial court also found that the State had proven the depravity allegation, noting that respondent had four felony convictions that were "directly related to the ability to parent and identifies [*sic*] the issues that are germane to parenting and need to be resolved." The court found that respondent had not rebutted the presumption of depravity raised by the felony convictions, pointing specifically to respondent's continued drug use and "instability in regards to the ability to go forward with reunification of his child."

¶ 46                              2. *The Best-Interest Proceedings*

¶ 47       In July 2024, the trial court conducted the best-interest portion of the termination proceedings. At the State's request, the court took judicial notice of the witness testimony presented during the fitness portion of the termination proceedings.

¶ 48                              a. Croll

¶ 49       The State again called Croll, who testified that D.N. was placed in a traditional foster home, which Croll visited once a month. Croll stated that D.N. had a strong bond with her foster parents, with whom she had lived since she was three months old. Croll emphasized,

"[T]hat's kind of like all she knows." The foster parents had committed to adopting D.N.

¶ 50 Croll also testified that D.N.'s foster parents were taking care of D.N.'s needs, noting that they took her to all medical appointments, enrolled her in daycare and dance classes, and had enrolled her in preschool for the upcoming school year. Croll believed that moving D.N. from her foster home would be disruptive to D.N. and that it was in D.N.'s best interest that respondent's parental rights be terminated. Croll specifically stated that she had safety concerns about respondent's substance abuse issues.

¶ 51 Croll also testified that D.N. had a half-sibling who was also in foster care at a different foster home. The foster parents of both children were committed to continuing sibling visitation, which was occurring monthly.

¶ 52 On cross-examination by respondent's attorney, Croll testified that she had observed respondent visit with D.N. and believed they had an emotional bond. She stated that D.N. called respondent "dad." She reiterated that she did not think respondent was "safe for [D.N.] to go home to" because of his substance abuse issues. Croll testified that D.N. had never visited respondent in his home, so Croll didn't know "if [D.N.] could potentially have access to anything there."

¶ 53 Croll further testified that D.N.'s foster parents were willing to allow respondent to have a relationship with D.N., but the process would have to "start slow," beginning with e-mail contact and "possibly more in the future."

¶ 54                                           b. Respondent

¶ 55 Respondent testified that he believed D.N.'s best interest would be served by being with her family members. He did not believe that her foster home would give her the "proper love that we're going to give her." Respondent testified that he had a bond with D.N. and

she would be emotionally damaged by no longer having that bond.

¶ 56    Respondent further testified that he did not have a relationship with the foster parents and did not believe he would be able to see D.N. or keep in contact with her if his rights were terminated. He stated that termination would be traumatizing to D.N. because "every time she do[es] visit with me, she recognize[s] me, and she runs straight to me." Respondent understood that, in the event the trial court did not terminate his parental rights, he would still have to complete his services to the satisfaction of DCFS. Respondent stated, "I'm willing to do whatever it takes." He testified that he had been going to his drug tests and "just started substance abuse [counseling]."

¶ 57    Respondent stated that he was a good father and he and D.N. would be "missing a big piece out of *** life" if his rights were terminated.

¶ 58    c. The Trial Court's Ruling

¶ 59    The trial court found that it was in D.N.'s best interest to terminate respondent's parental rights. When ruling, the court acknowledged that because D.N. recognized respondent as her father, "some trauma" would result from her not having a relationship with him, but the court ultimately found that D.N. would be more severely traumatized by being removed from her foster parents, with whom she shared a much stronger bond. The court further remarked as follows:

> "So certainly the factor of physical safety and welfare of the child is a concern, that attachment and familiarity and love is present in the foster home, that the child's sense of security is greatest there. And that's a difference between the actual safety which is present and the child's sense of safety. I can't imagine how a child of three years of age would feel to be abruptly torn away from the

only household she's ever known. And finally, the need for permanency is most satisfied by the continuing relationship and potential adoption of the child by the foster care placement, which is the only place she's ever known."

¶ 60  This appeal followed.

¶ 61                                    II. ANALYSIS

¶ 62  Respondent appeals, arguing that the trial court's (1) fitness and (2) best-interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 63                    A. The Trial Court's Fitness Determination

¶ 64  Respondent argues the trial court's finding that he was unfit was against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805. Based on our review of the record, we conclude that the court's finding that respondent failed to make reasonable progress within any of the nine-month periods alleged in the petition (October 2021 to July 2022, July 2022 to April 2023, and March 2023 to December 2023) was supported by the evidence. Accordingly, we discuss only that finding.

¶ 65                        1. *The Applicable Law and Standard of Review*

¶ 66  The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West

2022). Reasonable progress is an objective view of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51, 187 N.E.3d 763. Additionally, the Illinois Supreme Court has held that "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans." *In re C.N.*, 196 Ill. 2d 181, 216, 752 N.E.2d 1030, 1050 (2001). Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

¶ 67        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. Accordingly, a trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 68                                    2. *This Case*

¶ 69        The evidence in this case supports the trial court's finding that respondent failed to make reasonable progress toward the return of D.N. during any of the nine-month periods alleged in the motion for termination of parental rights.

¶ 70        The first nine-month period ran from October 2021 to July 2022, and the second nine-month period ran from July 2022 to April 2023. Respondent did not complete any services during either of these periods due to his incarceration from November 2021 through February 2023. We acknowledge, as the trial court did, that respondent was unable to perform services while incarcerated because the prison system did not offer any services, in part because of

COVID-19. However, as we have noted, progress is measured objectively and, unquestionably, as of April 2023, respondent had made no progress toward D.N.'s return to his care.

¶ 71        Nonetheless, the State did not seek termination of respondent's parental rights at that time. Respondent had reached out to Croll after his release and demonstrated a desire to complete services. To his credit, he completed parenting services in May 2023. However, the services that were most crucial to ensuring D.N.'s safety were domestic violence and substance abuse services. Respondent engaged in domestic violence classes but had not completed them within the third nine-month period, which ended in December 2023.

¶ 72        More concerning, however, is respondent's complete failure to address his long-standing substance abuse issues, which the trial court identified as an important concern needing treatment as early as the dispositional hearing in November 2021. Respondent's prior conviction for possession of cocaine and positive test results for cocaine in 2021 and 2024 (1) corroborate Croll's concerns for D.N.'s safety in respondent's care and (2) illustrate the need for respondent to address his long-standing drug problem. Respondent failed to attend the majority of his drug tests and tested positive for drugs or alcohol three of the eight times he did attend. Moreover, as late as the fitness portion of the termination proceedings, respondent had not yet obtained a substance abuse assessment, let alone completed any recommended treatment.

¶ 73        We acknowledge the efforts that respondent did make in this case, including his attending visits with D.N., obtaining housing and employment, and completing parenting and domestic violence services (although untimely). However, the question for this court is whether the trial court's determination that respondent failed to make reasonable, objective progress toward the return of D.N. to his care was against the manifest weight of the evidence or, put another way, clearly wrong. We reject the notion that the evidence did not support the trial

court's conclusion. Respondent had 27 months to work toward D.N.'s return to his care, and at the end of that period, he had not yet even begun the much needed services to address his substance abuse issues or even progressed to having D.N. visit him in his home. For these reasons, we affirm the trial court's finding regarding respondent's failure to make reasonable progress.

¶ 74                       B. The Trial Court's Best-Interest Finding

¶ 75                       1. *The Applicable Law and Standard of Review*

¶ 76            At the best-interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

See 705 ILCS 405/1-3(4.05) (West 2022).

¶ 77 A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 78                               2. *This Case*

¶ 79 The evidence in this case also supports the trial court's finding that it was in D.N.'s best interest to terminate respondent's parental rights.

¶ 80 D.N. was taken into care at three months old and spent the next three years of her life in the home of her foster parents, growing and bonding with them each day. D.N. felt safety, stability, and affection in their care, and her foster parents met her emotional, physical, medical, and developmental needs. D.N.'s foster parents have committed to adopting her and nurturing her relationship with her half-sibling. They have also expressed a willingness to slowly nurture D.N.'s bond with respondent.

¶ 81 Although D.N. has bonded with respondent and recognizes him as "dad," the evidence supports the trial court's conclusion that D.N.'s bond with her foster parents is much stronger and D.N. would be traumatized over the loss of that bond. Over the course of her three years of life, D.N. has visited with respondent only via video while he was incarcerated or in-person at the agency—never at his home. D.N. has never spent a night in respondent's care. Meanwhile, her foster parents have provided for her daily.

¶ 82 Accordingly, we affirm the trial court's finding that the termination of respondent's parental rights was in D.N.'s best interest.

¶ 83                                    III. CONCLUSION

¶ 84           For the reasons stated, we affirm the trial court's judgment.

¶ 85           Affirmed.